**2019 UT App 125**

## THE UTAH COURT OF APPEALS

LaMar Drew and LaRene Drew,
Appellants,
*v.*
Pacific Life Insurance Company,
Appellee.

Opinion
No. 20160314-CA
Filed July 18, 2019

Fourth District Court, Provo Department
The Honorable Darold J. McDade
No. 120402017

Steven G. Loosle, Paula W. Faerber, and Platte S.
Nielson, Attorneys for Appellants

Scott M. Petersen and David N. Kelley, Attorneys
for Appellee

Judge Gregory K. Orme authored this Opinion, in which
Judge Michele M. Christiansen Forster concurred.
Judge Jill M. Pohlman dissented, with opinion.

ORME, Judge:

¶1     LaMar and LaRene Drew appeal the district court's grant of summary judgment in favor of Pacific Life Insurance Company (Pacific) and the court's denial of the Drews' cross-motion for partial summary judgment on the issue of vicarious liability. The Drews contend that the district court erroneously determined that Pacific was not vicariously liable for the unlawful misrepresentations made by one of its appointed insurance producers, R. Scott National, Inc. (RSN). We reverse the summary judgment in favor of Pacific, and we remand for the entry of partial summary judgment in favor of the Drews.

JURISDICTION

¶2 Before turning to the merits, we pause briefly to consider our jurisdiction. The order appealed from was interlocutory in nature but was certified as final in contemplation of rule 54(b) of the Utah Rules of Civil Procedure. The certification does not meet the requirements laid out in a recent line of opinions from the Utah Supreme Court. *See EnerVest, Ltd. v. Utah State Eng'r*, 2019 UT 2, ¶¶ 16–20, 435 P.3d 209 (amended opinion); *Copper Hills Custom Homes, LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶¶ 15–17, 23–28, 428 P.3d 1133 (amended opinion); *First Nat'l Bank v. Palmer*, 2018 UT 43, ¶¶ 13–14, 427 P.3d 1169. Ordinarily in such a case, we dismiss for lack of jurisdiction. *See, e.g., Hayes v. Intermountain GeoEnvironmental Services Inc.*, 2018 UT App 223, ¶ 1, 437 P.3d 650. But these cases all recognize that we "have the discretion to treat an improper rule 54(b) certification as a request for leave to take an interlocutory appeal under rule 5(a) of the Utah Rules of Appellate Procedure." *Id.* ¶ 5 n.2. *Accord EnerVest*, 2019 UT 2, ¶ 20; *Copper Hills*, 2018 UT 56, ¶ 29 n.15; *Palmer*, 2018 UT 43, ¶ 14 n.4. This discretion to treat an appeal taken from a non-final order as though it were an authorized interlocutory appeal is exercised "judiciously and sparingly." *Copper Hills*, 2018 UT 56, ¶ 29 n.15. But it is exercised from time to time. *See, e.g., Hawkins ex rel. Hawkins v. Peart*, 2001 UT 94, ¶ 3 n.2, 37 P.3d 1062 (flawed rule 54(b) certification); *Chaparro v. Torero*, 2018 UT App 181, ¶¶ 28–31, 436 P.3d 339 (non-final order due to an outstanding attorney fee issue). *Cf. EnerVest*, 2019 UT 2, ¶ 20 (suggesting that discretion to treat a flawed rule 54(b) certification as an authorized interlocutory appeal might have been exercised if appellant had standing on appeal).

¶3 We believe that the considerations that have prompted Utah's appellate courts in prior cases to exercise their discretion to treat a flawed rule 54(b) certification as, instead, a granted petition for interlocutory appeal, or to decline to exercise

that discretion, are of only limited relevance in a subsequent case. Our resistance to a formulaic approach is inherent in the very concept of discretion. *See Warren v. United States Parole Comm'n*, 659 F.2d 183, 196 (D.C. Cir. 1981) ("[T]he essence of discretion is the absence of fixed rules."). *See also United States v. Richards*, 659 F.3d 527, 551 (6th Cir. 2011) ("It is the essence of discretion that it may properly be exercised in different ways and likewise appear differently to different eyes.") (quotation simplified); *Walen v. United States*, 246 F. Supp. 3d 449, 462 (D.D.C. 2017) ("Flexibility in the face of competing priorities . . . is the essence of discretion.") (quotation simplified).

¶4    We determine that this case is appropriate for the exercise of our discretion to treat the flawed rule 54(b) certification as an interlocutory appeal pursuant to rule 5(a) of our appellate rules. Having done so, we now turn to a resolution of the appeal on its merits.

BACKGROUND[1]

¶5    In 2009, Pacific appointed RSN as its insurance producer and authorized it to "solicit and procure applications for [Pacific's] life insurance and annuity products." The agreement, however, prohibited RSN from soliciting insurance products that did not meet the "customer's insurance needs and financial objectives." At the time the parties executed the agreement, Pacific had appointed other companies and individuals to sell its

---

1. When reviewing a district court's grant of summary judgment, "we review the facts in a light most favorable to the losing party" and "recite the facts accordingly." *Bodell Constr. Co. v. Stewart Title Guar. Co.*, 945 P.2d 119, 121 (Utah Ct. App. 1997) (quotation simplified).

insurance products,[2] and RSN sold annuities and insurance policies on behalf of numerous companies and individuals.

¶6     LaMar and LaRene Drew are retired senior citizens who, after seeing an advertisement, sought out one of RSN's employees as a financial advisor. At the outset, the employee assisted the Drews in the acquisition and sale of multiple annuities. Later on, and with the assistance of another RSN employee, the initial employee informed the Drews that, even though they were approaching eighty, they could purchase a life insurance policy with a high death benefit and resell it on the secondary market for a large profit.[3] Based on this information, the Drews purchased two $1.5 million life insurance policies, the first from PHL Variable Insurance Company (PHL) and the second from Pacific.[4] To fund the premiums on the policies, the

---

2. Pacific sells its insurance products in all fifty states, and as of December 2014, it had appointed 358 companies and 2,182 individuals to sell its insurance products on its behalf.

3. At the time of the transaction, Utah law clearly prohibited this sales tactic. *See* Utah Code Ann. § 31A-36-111(5) (LexisNexis 2010) ("A person may not issue, solicit, or market the purchase of a policy for the primary purpose of or with a primary emphasis on settling the policy."); *id.* § 31A-36-102(8) (defining life settlement as "assigning, selling, transferring, devising, releasing, or bequeathing" the death benefit of a policy).

4. One might ask how Pacific could possibly justify issuing such a policy in addition to the $1.5 million life insurance policy the Drews had with PHL. The record makes clear that the Drews' application to Pacific indicated that Pacific's policy was intended to replace the PHL policy rather than supplement it. Additionally, the application queried whether the Drews planned to transfer the policy "as a repayment of any

(continued…)

RSN employees advised the Drews to obtain a reverse mortgage on their home. The Drews followed this advice.

¶7      RSN was unable to sell the policies on the secondary market. After the Drews paid more than $300,000 in premiums and lost much of the equity in their home, the policies lapsed when the Drews could no longer afford the premiums. In total, they lost three-fourths of their life savings, and interest on their reverse mortgage is accruing at a rate of approximately $1,000 per month.

¶8      The Drews sued Pacific, claiming that it was vicariously liable for the tortious conduct of RSN's employees, whom the Drews contended were acting as Pacific's agents. Pacific and the Drews submitted cross-motions for summary judgment, and the district court granted summary judgment to Pacific. Although the court did not address whether an agency relationship existed between Pacific and RSN, it concluded that, even assuming such a relationship existed, RSN's employees were not acting within the scope of their authority as agents of Pacific. The Drews appeal.

ISSUE AND STANDARD OF REVIEW

¶9      The Drews contend that the district court erroneously granted summary judgment in favor of Pacific and that judgment should have been entered in their favor. "We review a district court's decision to grant summary judgment for

---

(…continued)
premium financing debt," to which an RSN employee answered "no." Thus, on paper, Pacific had no way of knowing that the Drews acquired the policy solely for investment purposes, although their ages would appear to suggest that possibility.

correctness." *Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 16, 215 P.3d 933.

ANALYSIS

¶10   On appeal, the Drews argue that the district court misapplied agency law when it concluded that Pacific was not vicariously liable for the misrepresentations made by RSN's employees. "Under principles of vicarious liability, a principal is held responsible for the tortious acts of an agent acting within the scope of the agent's authority." *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 19, 61 P.3d 1009. Thus, in order to determine whether Pacific is vicariously liable for the misrepresentations of RSN's employees, we must answer two questions. First, we must decide whether an agency relationship existed between Pacific and RSN. If we conclude that an agency relationship did exist, we must then determine whether RSN's employees acted within the scope of their authority in their dealings with the Drews.

I. Agency Relationship

¶11   Given its conclusion on the scope of RSN's authority, the district court deemed it unnecessary to determine whether an agency relationship existed between Pacific and RSN. The parties disagree about whether such a relationship existed.

¶12   The Insurance Code suggests that the existence of an agency relationship turns on whether an insurance salesperson is a "producer for the insurer" or a "producer for the insured." *See* Utah Code Ann. § 31A-1-301(88) (LexisNexis 2010).[5] If a

---

5. We cite the provision in effect when the Drews were solicited and bought their policies. But this provision, with minimal variations in numbering and phraseology, has been in effect

(continued…)

producer is "compensated directly or indirectly by an insurer for selling, soliciting, or negotiating an insurance product of that insurer," that producer is a producer for the insurer and is therefore its agent. *See id.* § 31A-1-301(88)(b)(i). In contrast, if a producer is "compensated directly and only by an insurance customer," that producer is a producer for the insured and is not an agent of the insurance company. *See id.* § 31A-1-301(88)(b)(ii)(A).

¶13 It is clear from the record that the RSN employees received compensation directly from Pacific. Thus, under the plain terms of the Insurance Code, RSN's employees were producers for Pacific and were therefore acting as its agents.

¶14 Nevertheless, Pacific argues that RSN's employees were independent insurance brokers rather than its agents. In support of this argument, Pacific relies on *Vina v. Jefferson Insurance Co.,* 761 P.2d 581 (Utah Ct. App. 1988), in which this court analyzed whether an insurance salesperson was an agent or a broker. *See id.* at 584–86. In *Vina,* we articulated some relevant considerations, including the discretion of the salesperson, the salesperson's role as an intermediary between the insurance company and the prospective insured, and the salesperson's ability to bind the insurance company. *Id.*

¶15 Importantly, *Vina* predates the current statutory regime, *see supra* ¶ 12 n.5, and we qualified our decision in that case by stating that it was made "under the controlling statutes" in effect

---

(…continued)
continuously since April 30, 2001. *See* Utah Code Ann. § 31A-1-301 (LexisNexis 2003) (amendment notes). *See also id.* § 31A-1-301(83); *id.* § 31A-1-301(85) (2005); *id.* § 31A-1-301(88) (2010); *id.* § 31A-1-301(94) (2017); *id.* § 31A-1-301(95) (Supp. 2018).

at the time, 761 P.2d at 585. The Insurance Code has since streamlined the agency determination in the insurance context, allowing courts to focus on how the insurance salesperson is compensated. *See* Utah Code Ann. § 31A-1-301(88). Thus, given *Vina*'s reliance on an outdated statute and the plain language of the now-controlling statute, the analysis in our previous decision is of limited utility at best. In any event, *Vina* is readily distinguishable from the case before us because the salesperson in *Vina* "was not specifically authorized to solicit insurance or otherwise act on behalf of" the insurance company. *Vina*, 761 P.2d at 584. Here, Pacific specifically appointed RSN as its producer and authorized RSN to solicit and procure insurance applications on its behalf.

¶16    Pacific contends that this interpretation of the Insurance Code will create a "per se agency relationship . . . , thereby imposing strict liability on the insurer." We disagree. While we recognize that the Insurance Code "does not supplant ordinary legal principles of agency," *see id.* at 585, we do not read the pertinent provisions as inconsistent with general agency law.

¶17    The Insurance Code provides as follows:

> There is a rebuttable presumption that every insurer is bound by any act of its appointed licensee performed in this state that is *within the scope of the appointed licensee's actual (express or implied) or apparent authority*, until the insurer has canceled the appointed licensee's appointment and has made reasonable efforts to recover from the appointed licensee its policy forms and other indicia of agency.

Utah Code Ann. § 31A-23a-405(2) (emphasis added). The Insurance Code simplified but did not alter the standard of liability applicable to agency relationships in the insurance context. *See Zions Gate R.V. Resort, LLC v. Oliphant*, 2014 UT App

98, ¶ 6, 326 P.3d 118 (stating that a principal is liable if its agent acts pursuant to its actual or apparent authority). Under both the common law and the revised statute, principals are liable for the tortious acts of their agents when the agents act within the scope of their authority. Thus, the Insurance Code's outline of agency relationships in the context of insurance producers does not, as Pacific suggests, impose "strict liability on the insurer for all of the acts of the appointed individual or entity."

## II. Scope of Authority

¶18 Having concluded that RSN and its employees were agents of Pacific, we must now analyze the scope of RSN's authority and whether it acted within that authority in misrepresenting the advisability of certain Pacific life insurance policies for the Drews. "Under principles of vicarious liability, a principal is held responsible for the tortious acts of an agent acting within the scope of the agent's authority." *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 19, 61 P.3d 1009.

¶19 Pacific first argues that RSN's employees acted outside the scope of their authority because the contract limited RSN to soliciting and procuring applications; the contract did not authorize RSN to bind Pacific to any contractual agreement. In so arguing, Pacific misapprehends the extent of agency liability. Agents are entitled to "do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988). Although RSN's employees may have lacked the authority to create a binding contract on behalf of Pacific, they could, in the course of solicitation, "induce the purchase of a policy . . . by misrepresenting the nature of a product or policy term." *See Dias v. Nationwide Life Ins. Co.*, 700 F. Supp. 2d 1204, 1221 (E.D. Cal. 2010). Thus, the proper inquiry is not limited to whether RSN

could legally bind Pacific but is more appropriately characterized as the broader question of whether RSN's employees were acting within the scope of their authority when they misrepresented to the Drews the advisability of their acquiring Pacific's life insurance policies.

¶20　Pacific also directs our attention to another provision in its contract with RSN that expressly prohibited RSN from soliciting and procuring insurance applications for products that did not "meet the customer's insurance needs and financial objectives."[6] Thus, citing *Bodell Construction Co. v. Stewart Title Guaranty Co.*, 945 P.2d 119 (Utah Ct. App. 1997), Pacific argues that it should not be held liable for RSN's solicitations in this case because, as Pacific sees it, an agent acts outside of his or her authority "where the authority to perform the specific task has been expressly limited." In *Bodell*, a principal limited its agent to issuing title insurance. *Id.* at 122. The agent, however, also took it upon itself to provide escrow services, despite having signed a contract prohibiting it from engaging in "escrow business." *Id.* Thus, because we concluded that the issuance of title insurance did not necessarily require the agent to perform escrow functions, and the insurer expressly prohibited it from acting as its agent in "escrow business," we held that the agent acted outside the scope of its authority in providing escrow services. *Id.* at 124–25.

---

6. Pacific notes that RSN's employees knew that the Drews did not require another $1.5 million life insurance policy in addition to the $1.5 million policy they already had with PHL. Indeed, from the standpoint of the typical reason for acquiring life insurance—providing for dependents upon the unexpected death of the insured—the Drews' need for life insurance in any amount is at least questionable. Of course, this would have been as obvious to Pacific, who wrote the policy, as it was to RSN, who solicited the policy.

¶21 *Bodell* is factually distinguishable from this case. In *Bodell*, the agent was performing a collateral function distinct from the activities it was authorized to perform, namely, the performance of escrow services. *Id.* Here, RSN's employees were authorized to solicit life insurance policies, and that is precisely what they did—albeit in an unprofessional, if not tortious, manner. *See* Restatement (Second) of Agency § 230 (Am. Law Inst. 1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment."). Indeed, a contrary rule to that stated in the Restatement section just quoted would essentially enable principals to eliminate vicarious liability through adroitly crafted contractual provisions.[7]

¶22 The United States Supreme Court has stated that "when a salesperson lies to a customer to make a sale, the tortious conduct is within the scope of employment because it benefits the employer by increasing sales, even though it may violate the employer's policies." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998). *See also* Restatement (Third) of Agency § 7.07

---

7. For example, in *Carter v. Bessey*, 93 P.2d 490 (Utah 1939), a company prohibited its deliverymen from using the delivery truck for personal reasons. *Id.* at 491. One of the company's agents completed his delivery route, drove the truck to purchase a Christmas tree for his family, and struck a pedestrian. *Id.* The Utah Supreme Court held that the company's prohibition did not excuse the company from liability. *Id.* at 493. The court noted that the "doctrine of respondeat superior exists irrespective of contract" and that principals may still be liable even when agents act "contrary to the express instructions of the [principal]." *Id.* And rightly so. If we followed Pacific's argument to its logical conclusion, trucking companies that expressly forbid drunk, drowsy, or negligent driving could avoid liability for the torts of their agents by contractually prohibiting driving in such a manner.

cmt. d (Am. Law Inst. 2006) ("[W]hen an employee's job duties include making statements to prospective customers to induce them to buy from the employer, intentional misrepresentations made by the employee are within the scope of employment unless circumstances establish that the employee has departed from it."). Courts that have considered the issue in the context of the sale of insurance products have routinely held insurance companies vicariously liable for the fraudulent misrepresentations made by their agents. *See, e.g., Weyand v. Union Central Life Ins. Co.*, No. 30-2013-00633423, 2016 WL 750433, at *7 (Cal. Ct. App. Feb. 26, 2016); *Pan-American Life Ins. Co. v. Roethke*, 30 S.W.3d 128, 132–33 (Ky. 2000); *Chicago Title Ins. Co. v. Washington State Office of Ins. Comm'r*, 309 P.3d 372, 381–83 (Wash. 2013). *See also Cook v. John Hancock Life Ins. Co.*, No. 7:12–cv–00455, 2015 WL 178108, at *9 (W.D. Va. Jan. 14, 2015) (denying a motion to dismiss because the misrepresentations about a life insurance policy "were arguably within the scope of [the agent's] actual or apparent authority").

¶23 *Weyand* bears a strong resemblance to the facts of this case. In *Weyand*, an insurance agent convinced a plaintiff to purchase $10 million worth of life insurance policies for resale on the secondary market, claiming that such a tactic was a "no-risk investment opportunity." 2016 WL 750433, at *1. As was the case with the Drews, the plaintiff in *Weyand* was unable to resell the policies and they lapsed after the plaintiff could no longer afford to pay the steep premiums. *Id.* The insurance company contended that it could not be held liable because it expressly prohibited its agent from selling policies to insureds who intended to resell them on the secondary market. *Id.* at *4. The California Court of Appeal disagreed, reasoning that the "ordinary scope" of the acts entrusted to the agent "included not only selling policies, but also describing the policies and making representations to potential purchasers about the policies' coverage, costs, and other characteristics." *Id.* at *5. The court then noted that the ability to resell a policy on the secondary

market "is a characteristic of the policy an insurer reasonably could expect an agent to discuss with a potential purchaser." *Id.*

¶24    We agree that making representations about a policy, including the ability to resell it, is consistent with the general work with which RSN was entrusted, that is, solicitation of life insurance policies.[8] Further, RSN's actions inarguably served Pacific's interest. RSN's representations resulted in the issuance of a Pacific policy and in the Drews making premium payments directly to Pacific. Accordingly, RSN's employees were acting within the scope of their authority. *See M.J. v. Wisan*, 2016 UT 13, ¶ 54, 371 P.3d 21.

¶25    We believe our conclusion is fully in accord with well-established principles of agency law. Insurance and its corresponding markets are extremely complicated, and insurance producers are often the only person or entity that consumers deal with when making decisions about their insurance needs. It makes little sense to allow insurance companies to grant broad solicitation authority to their agents—who inevitably make many representations to prospective insureds in hopes of closing a deal—and accept the benefits therefrom without holding them accountable for the damages resulting from those very same representations. *See* Restatement (Second) of Agency § 8A cmt. a (Am. Law Inst. 1958) ("It would be unfair for an enterprise to have the benefit of the work of its agents without making it responsible to some extent for their excesses and failures to act carefully.").

---

8. The Insurance Code defines soliciting as "attempting to sell insurance" or "asking or urging a person to apply for . . . a particular kind of insurance . . . from a particular insurance company." Utah Code Ann. § 31A-23a-102(13) (LexisNexis 2010). The representations made by RSN's employees fall within the ambit of this definition.

CONCLUSION

¶26 The district court erroneously granted summary judgment in favor of Pacific. An agency relationship existed between Pacific and RSN, and RSN's employees were acting within the scope of their authority when they made misrepresentations regarding life insurance policies to the Drews. We therefore reverse the decision of the district court and remand so that it may enter partial summary judgment in favor of the Drews on the issue of vicarious liability[9] and then proceed with trial or such other proceedings as may now be appropriate.

———————

POHLMAN, Judge (dissenting):

¶27 I respectfully dissent from this decision because I regrettably conclude that we lack jurisdiction to consider this appeal.

¶28 As the majority correctly notes, the rule 54(b) certification entered in this case is flawed and thus does not properly invoke our jurisdiction. And while I agree that we have discretion to treat certain rule 54(b) certifications as petitions for interlocutory appeal, Utah R. App. P. 5(a), I do not agree that this case warrants this particular treatment. Converting a rule 54(b)

———————

9. In doing so, we recognize that the scope of an agent's authority is ordinarily a question of fact. *See Christensen v. Swenson*, 874 P.2d 125, 127 (Utah 1994). But because RSN's employees were clearly acting within the scope of their authority, given the record before us and the concession of both sides that the material facts are not in dispute, we decide the issue as a matter of law. *See id.*; *Birkner v. Salt Lake County*, 771 P.2d 1053, 1057 (Utah 1989).

certification into an interlocutory appeal "is an allowance that we should wield judiciously and sparingly," and I think the better course of action would be to remand the case to the district court where the parties would have the opportunity to seek a compliant certification of the relevant orders. *See Copper Hills Custom Homes, LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶ 29 n.15, 428 P.3d 1133.

_____