2002 UT 99

**WARDLEY BETTER HOMES AND GARDENS, Plaintiff and Respondent,**

v.

**Tracy CANNON, Cannon Associates, Inc., a Utah corporation, Leland J. Mascaro, and Sheri Mascaro, Defendants and Petitioners.**

No. 20010245.

Supreme Court of Utah.

Oct. 11, 2002.

Rehearing Denied Dec. 11, 2002.

Steven B. Smith, William G. Wilson, Salt Lake City, for plaintiff.

Mark O. Morris, David N. Wolf, Salt Lake City, for petitioners.

Leland J. Mascaro and Sheri Mascaro, defendants pro se.

HOWE, Justice.

## INTRODUCTION

¶ 1 We granted certiorari to review a court of appeals decision affirming the trial court's denial of petitioner Tracy Cannon's motion for attorney fees made under Utah Code Ann. § 78–27–56 (1996). *Wardley Better Homes & Garden v. Cannon,* 2001 UT App 48, 21 P.3d 235.

## FACTUAL SETTING

¶ 2 Arles Hansen, an agent of respondent real estate brokerage Wardley Better Homes and Gardens, fraudulently changed the duration of four real estate listing agreements between Wardley and property sellers Leland and Sheri Mascaro. The agreements gave Wardley the exclusive right to list the Mascaros' property for sale and required the Mascaros to pay the brokerage a seven percent commission if it found a buyer who would purchase the property for the Mascaros' asking price.

¶ 3 Hansen and the Mascaros signed the agreements November 14, 1993, with the mutual understanding that they would expire the next day, November 15, 1993. They filled out the dates in the first agreement to reflect this understanding; they left the spaces for an expiration date in the other three agreements blank. After obtaining the Mascaros' signatures on each of the listing agreements, Hansen altered the expiration date of the first agreement from November 15, 1993, to November 15, 1994, and wrote the same fraudulent date in the blank spaces of the other three listing agreements.

¶ 4 Subsequently, in 1994, the Mascaros entered into a year-long listing agreement with the real estate brokerage Cannon Associates, Inc., through Tracy Cannon, its principal broker. Ultimately, the Mascaros sold their property to Tracy Cannon, individually, and she received a commission of $115,338.16 for her work as an agent on the sale.

¶ 5 Upon learning that the Mascaros had sold their property, Wardley filed this action against them, alleging that the Mascaros had breached their contract by not paying Wardley a commission when presented with a qualified buyer. The Mascaros counterclaimed, alleging negligence, fraud, and breach of contract. Eventually, Wardley amended its complaint to include causes of action against Tracy Cannon and Cannon Associates, Inc. ("Cannon") for unlawful interference with contract in violation of Utah Code Ann. §§ 61-2-11(15), (18), and 61-2-17(4) (1993 & Supp.1996), interference with a prospective economic relationship, and conversion.

¶ 6 Deposition testimony indicated that Wardley's decision to bring suit against the Mascaros and Cannon was made jointly by Hansen, Hansen's wife, who was also a Wardley agent, and Dougan Jones and Ken Tramp, brokers and co-managers of the Wardley office out of which the Hansens operated. Under an agreement with Wardley, the Hansens, who still worked for Wardley at that time, were obligated to pay eighty percent of the litigation costs, and Wardley was obligated to pay the other twenty percent. After a bench trial, the court ruled against Wardley on all claims, holding that Wardley had failed to establish any cause of action against Cannon. The court found further that Hansen had fraudulently induced the Mascaros to sign the listing agreements by assuring them that the agreements would be limited to one day.

¶ 7 Following the trial, Cannon and the Mascaros moved for an award of attorney fees pursuant to section 78-27-56 of the Utah Code, which provides:

(1) In civil actions, the court shall award reasonable attorney's fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith, except under Subsection (2).

(2) The court, in its discretion, may award no fees or limited fees against a party under Subsection (1), but only if the court:

(a) finds the party has filed an affidavit of impecuniosity in the action before the court; or

(b) the court enters in the record the reason for not awarding fees under the provisions of Subsection (1).

Utah Code Ann. § 78-27-56 (1996).

¶ 8 The trial court denied Cannon's motion. It reasoned that because Wardley "represented that it did not have knowledge of Hansen's fraudulent acts" and because Wardley did not pursue "its claims to hinder, delay, defraud, or otherwise take unconscionable advantage of Cannon," the case was not brought in bad faith and was not without merit. Cannon appealed, and we transferred the case to the court of appeals.

¶ 9 Before the court of appeals, Cannon relied on *Hodges v. Gibson Products Co.*, 811 P.2d 151 (Utah 1991), asserting that Hansen's knowledge of his own fraud—specifically his knowledge that the listing agreements were intended by both parties to be for only one day—should be imputed to Wardley. Cannon argued further that once knowledge of Hansen's fraud was imputed to Wardley, Wardley's action to enforce what it knew, by imputation, to be nonexisting contractual obligations was without merit and brought in bad faith. Thus, Cannon asserted, the trial court should have awarded her attorney fees.

¶ 10 The court of appeals rejected Cannon's argument and affirmed the trial court's denial of attorney fees. *Wardley Better Homes & Garden v. Cannon*, 2001 UT App 48, ¶¶ 7–12, 21 P.3d 235. It held that because a finding of bad faith is a factual question, on appeal Cannon was required to marshal the evidence supporting the trial court's finding that Wardley did not act in bad faith. *Id.* at ¶ 7 (citing *Valcarce v. Fitzgerald*, 961 P.2d 305, 312 (Utah 1998)). Because Cannon failed to marshal the evidence in support of that finding, the court of appeals concluded that it must assume the record supported the trial court's finding and that such an assumption was "fatal" to Cannon's appeal. *Id.*

¶ 11 The court of appeals also rejected Cannon's argument on the merits, holding that Hansen's knowledge could not be imputed to Wardley for the purpose of determining entitlement to attorney fees. *Id.* at ¶¶ 8–11, 21 P.3d 235. "[V]icarious liability," it reasoned, "[is] a theory ordinarily applied only in tort and in limited circumstances to punitive damages," *id.* at ¶ 8, and "[t]here is no legal support for [Cannon's] claim that vicarious liability should be applied in a manner that imputes the agent's knowledge to the principal to answer for the principal's own actions." *Id.* at ¶ 11. Thereafter, Cannon petitioned for, and we granted, certiorari.

## STANDARD OF REVIEW

¶ 12 "We review the court of appeals' decision for correctness, and give its conclusions of law no deference." *Newspaper Agency Corp. v. Auditing Div.*, 938 P.2d 266, 267 (Utah 1997).

## ANALYSIS

¶ 13 Cannon asserts that the court of appeals erred by holding (1) that Cannon's failure to marshal the evidence was fatal to her appeal; (2) that Hansen's knowledge may not be imputed to Wardley; and (3) that, in any event, Cannon was not entitled to attorney fees under section 78-27-56 of the Utah Code. We address each issue in turn.

## I. FAILURE TO MARSHAL THE EVIDENCE

¶ 14 Cannon argues that the court of appeals erred by holding that Cannon's failure to marshal the evidence was fatal to her appeal. To mount a successful challenge to a trial court's findings of fact, an appellant must marshal the evidence supporting the trial court's findings. *See, e.g., Cornish Town v. Koller*, 758 P.2d 919, 922 (Utah 1988). Challenges to a trial court's legal determinations, however, do not require an appellant to marshal the evidence. Here, Cannon does not attack the trial court's factual findings. Instead, she contends that the trial court erred as a matter of law by refusing to impute knowledge of Hansen's conduct to Wardley. Cannon is correct that whether an agent's knowledge should be imputed to his principal raises a legal question. *See Hodges*, 811 P.2d at 159 (imputing knowledge of an agent to his principal "as a matter of law"). Consequently, Cannon's failure to marshal the evidence should not have been fatal to her appeal. Thus, the court of appeals erred in summarily rejecting Cannon's appeal on that basis.

## II. IMPUTATION OF HANSEN'S KNOWLEDGE TO WARDLEY

¶ 15 Cannon next contends that the court of appeals erred by refusing to impute Hansen's knowledge of his own fraudulent conduct to Wardley.

### A. Imputation of Knowledge Generally

¶ 16 Under longstanding Utah law, "the knowledge of [an] agent concerning the business which he is transacting for his principal is to be imputed to his principal." *First Nat'l Bank v. Foote*, 12 Utah 157, 168, 42 P. 205, 207 (1895). A principal is imputed with "[a]n agent's knowledge of matters within the scope of his or her authority [because] ... it is presumed that such knowledge will be disclosed to the principal." *Macris v. Sculptured Software, Inc.*, 2001 UT 43, ¶ 21, 24 P.3d 984. This rule is broad, encompassing " *'all notice or knowledge* relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority.' "

*Latses v. Nick Floor, Inc.,* 99 Utah 214, 222, 104 P.2d 619, 623 (1940) (emphasis added) (quoting 2 F. Mechen, *Law of Agency* § 1813, at 1397 (2d ed.1914)); *see also* 3 C.J.S. *Agency* § 432 (1973) ("[A] principal is affected with constructive knowledge, regardless of his actual knowledge, of *all material facts* of which his agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, although the agent does not in fact inform his principal thereof." (emphasis added)).

¶ 17 By misinterpreting our holding in *Hodges v. Gibson Products Co.,* 811 P.2d 151 (Utah 1991), the court of appeals overlooked this well-established principle. In *Hodges,* Cosgrove, the manager of a Gibson Products Company store, stole money from the store. *Id.* at 154–55. He accused Hodges, a part-time bookkeeper, of stealing a portion of the money and went with other Gibson officials to the police and pressed for criminal charges on behalf of the store. *Id.* at 155. Before Hodge's trial, Cosgrove's actions came to light, and the charges against Hodges were dropped. *Id.* We affirmed a jury verdict against Gibson and Cosgrove for malicious prosecution and applied the general rule stated above, imputing to Gibson Cosgrove's knowledge that prosecution of Hodges was improper. *Id.* at 156–61.

¶ 18 The court of appeals interpreted our decision in *Hodges* to mean that the "knowledge of an employee can be imputed to his employer when an employee tortiously brings a legal action (which is at least partially motivated to carry out the employer's purposes) if it is within the scope of the employee's authority to bring the action," *Wardley,* 2001 UT App 48 at ¶ 10, 21 P.3d 235, and that "the agent's knowledge of an opposing party's innocence, *at the time the agent tortiously initiates legal proceedings* on behalf of his principal, is imputed to the principal." *Id.* at ¶ 11. As to this case, however, the court of appeals stated that "[t]here is no legal support for [Cannon's] claim that vicarious liability should be applied in a manner that imputes the agent's knowledge to the principal to answer for the principal's own actions." *Id.* And the court of appeals con-

cluded that in order to impute Hansen's knowledge to Wardley, Cannon "would have to show that Wardley's suit was brought: (1) in tort, (2) by Hansen who (3) was acting within the scope of his employment in bringing the suit." *Id.* at ¶ 10.

¶ 19 This reasoning is flawed. First, the court of appeals' interpretation of *Hodges* blurs the distinction between vicarious liability and imputation of knowledge. Whether a principal is vicariously liable for an agent's acts and whether a principal is imputed with his agent's knowledge are separate legal questions. *See Allen v. Prudential Prop. & Cas. Ins. Co.,* 839 P.2d 798, 806 n. 16 (Utah 1992) (stating that a principal may be "vicariously liable for the ... conduct of its agent, or it may directly incur ... liability by the imputation of the agent's knowledge"). While vicarious liability is generally limited to tort cases, we have applied the principle of imputation of knowledge to cases lying in tort, contract, securities, and property law. *See, e.g., Macris v. Sculptured Software, Inc.,* 2001 UT 43, ¶ 21, 24 P.3d 984 (imputing knowledge in a conversion case); *Hodges,* 811 P.2d at 157 (imputing knowledge in a malicious prosecution tort case); *Hardy v. Prudential Ins. Co. of Am.,* 763 P.2d 761, 767 (Utah 1988) (imputing knowledge in an insurance dispute); *Strand v. Prince–Covey. & Co.,* 534 P.2d 892, 894 (Utah 1975) (recognizing that knowledge may be imputed in a securities case); *Harris–Dudley Plumbing Co. v. Prof'l United World Travel Assoc., Inc.,* 592 P.2d 586, 589 (Utah 1979) (imputing knowledge of the commencement of a proceeding in a lien case). Under principles of vicarious liability, a principal is held responsible for the tortious acts of an agent acting within the scope of the agent's authority. *See Birkner v. Salt Lake County,* 771 P.2d 1053, 1056–59 (Utah 1989); *Phillips v. JCM Dev. Corp.,* 666 P.2d 876, 881–83 (Utah 1983). Under principles of imputation, a principal is held responsible for his own act, which is deemed to have been committed with the knowledge his agent had at the time of the principal's act, assuming the agent obtained such knowledge while acting within the scope of his authority. *See Allen,* 839 P.2d at 806; *see also* 3 C.J.S. *Agency* § 432 (1973).

¶20 Second, the court of appeals' reasoning is faulty because *Hodges* does not stand for the proposition that an agent's knowledge may be imputed to a principal only when the agent commits the act for which the principal's responsibility is sought. In *Hodges,* we stated that the "personal knowledge material to the liability that a servant has when acting in a matter as to which the master has empowered the servant to act is also imputed to the master." 811 P.2d at 157. The court of appeals thus correctly recognized that under *Hodges* "knowledge of an employee can be imputed to his employer when an employee tortiously brings a legal action" that is in some degree motivated to fulfill the employer's purposes. *Wardley Better Homes & Garden v. Cannon,* 2001 UT App. 48, ¶ 10, 21 P.3d 235. However, initiation of wrongful legal action by the employee is only one of the circumstances in which " 'the liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information.' " *Hodges,* 811 P.2d at 157 (quoting Restatement (Second) of Agency § 272 (1958)). This rule applies also to the slightly different circumstances of the instant case in which the employer itself initiated the suit at the employee's urging, based on information that the employee knew to be fraudulent. We can find no authority that suggests otherwise. If we were to impute an agent's *knowledge* to his principal only when the principal is being sought to account for his agent's *acts,* imputation of knowledge would be a wholly superfluous legal principle because in each instance it might apply, the principal could simply be held responsible by means of vicarious liability. If accepted, this notion would dramatically alter agency law as it now exists.

### B. Imputation of Subjective Belief or Intent

¶ 21 While the law does not place a limit on the type of knowledge that may be imputed from an agent to a principal, there is a limitation on the purpose for which imputed knowledge may be used. Generally, because imputed knowledge is constructive, it cannot be used when determining an individual's subjective mental state. *See In re Worthen,* 926 P.2d 853, 870 (Utah 1996) (holding that imputed knowledge is insufficient to satisfy a finding of willful misconduct necessary to discipline a judge under Utah Const. art. VIII, § 13); 3 C.J.S. *Agency* § 446 (1973) (stating that imputed knowledge should not be used when determining whether a principal acted in good faith and when determining whether a principal actually intended to form a contract).

¶ 22 This limitation does not apply, however, in cases where the principal is a corporation. Knowledge can always be imputed to a corporation—even when used to determine a subjective mental state—because a corporation has no belief or intent independent of that of its officers and agents. *See* 9A *Fletcher Cyclopedia of Private Corporations* § 4589 (perm.ed., rev.vol.2000) (stating that "corporations, being artificial legal entities, can have only that knowledge which is imputed to them under principles of agency law"). In other words, a corporation's knowledge is entirely "imputed to it from the knowledge possessed by its officers and agents." *Lowe v. April Indus., Inc.,* 531 P.2d 1297, 1299 (Utah 1974). Accordingly, a corporation's malice, intent, or bad faith "consists of the motives which prompt the action of its representatives; the requisite state of mind must necessarily be that of its employee or agent." 18B Am.Jur.2d *Corporations* § 2129 (1985); *see also* 10 *Fletcher Cyclopedia of Private Corporations* § 4882 (perm.ed., rev.vol.2001) ("While it is true that a corporation cannot in reality entertain any intent or malice, a specific intent or malice entertained by an agent or employee of a corporation can be imputed to corporation where it was done in the course of employment.").

¶ 23 Under section 78–27–56, a finding of bad faith is dependent upon a party's subjective belief or intent. *Valcarce v. Fitzgerald,* 961 P.2d 305, 315–16 (Utah 1998); *see also Mattiza v. Foster,* 311 Or. 1, 803 P.2d 723, 729 (1990) (stating that a determination of bad faith "requires an inquiry into the subjective intent of the losing party"); 10 James Wm. Moore et al., *Moore's*

Federal Practice § 54.171[2][c][iii] (3d ed. 1997) (stating that in federal court system the consensus is that fees based on bad faith litigation are proper "only when the actions at issue were taken in subjective bad faith"). The knowledge of an agent, therefore, should not be imputed to his principal for the purpose of determining attorney fees under section 78-27-56 where the principal is a natural person because he is capable of holding a subjective belief or intent independent of his agent. When the principal is a corporation, however, the knowledge of its officers and agents should be imputed relative to an award of attorney fees because the corporation cannot have good faith independent of those officers and agents. To hold otherwise would always preclude an award of attorney fees against a corporation under this section, a result we do not believe the legislature intended. Consequently, we hold that the knowledge of a corporation's agent, acting within the scope of his authority, may be imputed to the corporation for the purpose of determining whether attorney fees should be awarded under section 78-27-56.

¶ 24 Wardley is a corporation and, consequently, the knowledge of its agents and officers, obtained while acting within the scope of their duty, may be imputed to it for the purpose of determining attorney fees under section 78-27-56.

### C.  Employee v. Independent Contractor

¶ 25 Wardley, nevertheless, contends that Hansen's knowledge cannot be imputed to it because Hansen was an independent contractor and not an employee. This argument fails because we have clearly held that "[t]he relationship between a real estate broker and its agents is that of employer and employee." White v. Fox, 665 P.2d 1297, 1301 (Utah 1983); see also Phillips v. JCM Dev. Corp., 666 P.2d 876, 881 (Utah 1983).

### D.  Scope of Authority

¶ 26 Wardley also argues that Hansen acted outside the scope of his authority by fraudulently inducing the Mascaros to sign the listing agreements. Contrary to the court of appeals' assertion that Hansen "did not, under any agency theory, have authority to fraudulently change the dates on those agreements," Wardley, 2001 UT App 48 at n. 5, 21 P.3d 235, the fact that Hansen committed fraud does not necessarily mean that he acted outside his authority. Scope of authority " 'refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.' " Birkner v. Salt Lake County, 771 P.2d 1053, 1056 (Utah 1989) (quoting W. Keeton, Prosser and Keeton on the Law of Torts § 70, at 502 (5th ed.1984)). Accordingly, "[a]n agent does not cease to act within the course of his employment merely because he engages in a fraud upon a third person; it is of no consequence that he is deceiving the principal along with the third person." 37 Am.Jur.2d Fraud and Deceit § 311 (1985); see also 3 C.J.S. Agency § 397 ("[T]he agent does not cease to act within the scope of his authority because he engages in fraud directed against the third person.").

¶ 27 In order to determine whether an employee acts within the scope of his authority, we evaluate three factors:

First, an employee's conduct must be of the general kind the employee is employed to perform. . . .

Second, the employee's conduct must occur within the hours of the employee's work and the ordinary spatial boundaries of the employment. . . .

Third, the employee's conduct must be motivated, at least in part, by the purpose of serving the employer's interest.

Birkner, 771 P.2d at 1056-57. Here, it is indisputable that Hansen acted within the scope of his authority in obtaining the listing agreements from the Mascaros. Hansen's conduct clearly was of the "general kind" that he was employed to perform because real estate agents routinely procure listing agreements in the process of selling real estate. In fraudulently obtaining the agreements from the Mascaros, Hansen also acted within the hours and ordinary spatial boundaries of his work; real estate agents typically are in the homes of their clients and often

work on weekends. Finally, Hansen's actions clearly were designed to benefit Wardley. Under the listing agreements, Wardley was eligible for a potential commission, and Wardley commenced legal action in an attempt to secure that commission. In sum, Hansen's actions cannot be " 'regarded as [anything but] methods, even though improper ones, of carrying out the objectives of [his] employment.' " *Birkner,* 771 P.2d at 1056 (quoting W. Keeton, *Prosser and Keeton on the Law of Torts* § 70, at 502 (5th ed.1984)); *see also Christensen v. Swenson,* 874 P.2d 125, 127 (Utah 1994) ("[W]hen the employee's activity is so clearly within or outside the scope of employment that reasonable minds cannot differ, the court may decide the issue as a matter of law."). Consequently, his knowledge of the fraudulent listing agreements is imputable to Wardley for the purpose of determining attorney fees under the statute.

*E. Meritless Claim Pursued in Bad Faith*

¶ 28 Finally, Cannon argues that once Hansen's knowledge has been imputed to Wardley, Wardley should be liable for attorney fees under section 78–27–56. Under this section, Wardley's "action or defense to the action" must be "without merit and not brought or asserted in good faith" before Cannon can recover attorney fees. Utah Code Ann. § 78–27–56(1) (1996).

¶ 29 The court of appeals held that even if Hansen's knowledge was imputed to Wardley, Cannon could still not recover because there was no showing of bad faith. We disagree. A party acts in bad faith when he brings an action and either (1) lacks an honest belief in the propriety of the activities in question, (2) intends to take unconscionable advantage of others, or (3) intends to or has knowledge of the fact that his actions will hinder, delay, or defraud others. *Cady v. Johnson,* 671 P.2d 149, 151 (Utah 1983). At the very least, once Hansen's knowledge was imputed to Wardley, Wardley automatically lacked an honest belief in the propriety of bringing a suit to collect a commission under a fraudulently-obtained listing agreement. Wardley is charged with knowing that it did not have a legal right to a commission.

Moreover, with Hansen's knowledge of his fraud imputed to Wardley, Wardley is deemed to have known that its unjustified action against Cannon would hinder, delay, or defraud by causing Cannon to spend resources in her defense. Because Hansen's knowledge is imputed to Wardley, Wardley does not need to have independent knowledge of Hansen's fraudulent actions. Therefore, we hold that Wardley acted in bad faith in bringing suit against Cannon.

¶ 30 A claim is without merit if it is "frivolous," is "of little weight or importance having no basis in law or fact," or "clearly [lacks a] legal basis for recovery." *Id.* at 151. Wardley's claim was without merit because it "clearly had no legal basis for recovery." *Id.* Its action was based on fraudulently-altered listing agreements. The fact that the case went to trial does not change the fact that Wardley's case lacked any merit.

¶ 31 Consequently, Wardley both acted in bad faith and pursued a meritless claim in prosecuting this action against Cannon and thus may be subject to attorney fees under section 78–27–56. Contrary to the conclusion of the trial court, there is no inequity in this outcome. Where a party has acted on a meritless claim and in bad faith, in most cases it would be inequitable *not* to award attorney fees. This is especially true in the case before us where Hansen, who was forbidden by law from bringing his own action to recover on the listing agreements, *see* Utah Code Ann. § 61–2–18(1) (1993), was an active participant in Wardley's decision to file this action against Cannon.

III. FINDINGS UNDER SUBSECTION 78–27–56(2)

¶ 32 Wardley asserts that even if the trial court erred in its determination that Wardley did not act in bad faith and that Wardley did not bring a meritless claim under section 78–27–56(1), section 78–27–56(2) allows the trial court to refuse to award attorney fees if it makes its reasons known on the record. Section 78–27–56(2)(b) provides: "The court, in its discretion, may award no fees or limited fees against a party under Subsection (1), but only if ... the

court enters in the record the reason for not awarding fees under the provisions of Subsection 1." However, the trial court's discretion under section 78–27–56(2) cannot be used to support an erroneous ruling under section 78–27–56(1). An award of no or limited fees under section 78–27–56(2) is predicated on proper findings. In this case, the trial court erred by finding that Wardley's action did not lack merit and was not brought in bad faith under section 78–27–56(1). This finding, and the trial court's errant finding regarding the lack of equity in awarding attorney fees, cannot be used as reasons for denying attorney fees under section 78–27–56(2). Nevertheless, we are constrained to allow the trial court the opportunity to exercise its discretion under section 78–27–56(2) in light of our holding.

## CONCLUSION

¶ 33 The court of appeals erred in affirming the trial court's refusal to impute Hansen's knowledge to Wardley and the trial court's determination that Wardley did not act in bad faith in bringing this meritless action against Cannon. We reverse the judgment of the court of appeals and remand the case to that court with directions that the case be remanded to the trial court to award reasonable attorney fees to Cannon unless, relying on a legally sufficient reason, it declines to do so under section 78–27–56(2).

¶ 34 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice RUSSON, and Justice WILKINS concur in Justice HOWE's opinion.